UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Western Division

FILED
97 JUN 19 PM 3:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

Carleen Garnett, et al., )
    Plaintiff(s); )
    )
-vs.- ) No. CV 94-P-2154-W
    )
Cotton Patch Restaurant, et al., )
    Defendant(s). )

ENTERED
JUN 19 1997

## MEMORANDUM OPINION

    Pending for resolution are the defendants' motions for summary judgment, as well as a motion for partial summary judgment filed on behalf of two of the plaintiffs. The motions have been under submission for an unduly prolonged period of time as the court has struggled with the difficult issues presented. For the reasons stated below, the defendants' motions are due to be granted and the plaintiffs' motion is due to be denied.

### FACTS

    The Cotton Patch is a restaurant located in Greene County, Alabama, a poor rural county with a predominantly black population and workforce. The restaurant is known for its log cabin structure and unique atmosphere—which has been variously described as "depicting the 1800s" (Plaintiff's brief, p. 2) or resembling an "Old South Plantation" (Plaintiff's complaint, p.1) or as a "frontier" style ranch (Brown depo., pp.73-74). All waitresses wear similar dresses, costumes, or uniforms—which, according to the plaintiffs' complaint, are "Aunt Jemima clothing" that "typify the garments worn by black house slaves during the 18th and 19th centuries."

    The plaintiffs are twelve black females who worked as waitresses at the Cotton Patch during the Spring and early Summer of 1994. Suing for damages and attorneys' fees, they assert that they were subjected to a "pattern of racial harassment, discrimination, and involuntary economic

servitude" in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991[1]. They have sued (1) The Cotton Patch Restaurant, a corporation which owned the restaurant from 1977 until 1995, (2) Bradley Brown, a white male, who is the sole stockholder of the corporate defendant and who actively managed the restaurant from 1977 until his retirement in March 1994, and (3) Alice Ramsey, a white female, who became co-manager of the restaurant after Brown's retirement. The other co-manager is Virginia Holley, a black female, who for many years has been the kitchen manager. Although not named as a defendant, Holley is a key figure in the litigation since her responsibilities included the hiring, firing, and supervising of the waitresses, cooks, dishwashers, busboys and bartenders.

The event precipitating this lawsuit was a remark made on June 11, 1994, by Ramsey, the new restaurant manager, in a private conversation with Holley—a remark, however, that was reported by Holley to other black employees and may have been overheard by one of the plaintiffs. During this conversation, Ramsey, in referring to some of the Cotton Patch employees, used the word "nigra" (according to Ramsey) or "nigger" (according to the plaintiffs).[2] A major commotion quickly erupted in the work force. In a hastily-called meeting with all black employees, including the twelve plaintiffs, Ramsey apologized for her remark.

Ramsey's apology did not, however, satisfy the twelve plaintiffs. On June 17th, after some of them had met with local civil rights activists, pickets appeared at the Cotton Patch, complaining about Ramsey's June 11th remark and about the dresses worn by the waitresses. The restaurant also received a telephone threat, warning of a bomb set to explode during the evening meal.[3] Other

---

1. Plaintiffs' claims for intentional infliction of emotional distress were dismissed by court order in November 1994. Plaintiffs have not asserted claims under Title VII of the Civil Rights Act of 1964.
2. Given the standard under Rule 56, the court assumes, for purposes of the defendants' summary judgment motions, that the plaintiffs' version is correct.
3. The building was vacated and searched; no bomb was found.

2

threats were made, including a death threat received over the telephone by Ramsey. On June 18th, Brown, who had been out of the state on June 11th, closed the restaurant for security reasons.

Brown subsequently suspended Ramsey for two weeks without pay and required that she attend a counseling session at her own expense. He also arranged a "sensitivity" program for all employees to be conducted at the restaurant by persons trained in race relations. Only four of the plaintiffs attended, and they remained for only about an hour of the training session. The twelve plaintiffs declined the company's invitation to return to work when the restaurant finally reopened on August 30th. At some later point, unclear from the evidence submitted, the restaurant was sold by the corporate defendant, and apparently neither it nor Brown have any involvement with the restaurant at this time.

## STANDARD FOR SUMMARY JUDGMENT

The basic principles governing summary judgment under Fed. R. Civ. P. 56 were clarified in the trilogy of cases decided by the Supreme Court in 1986: *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Summary judgment is proper if, based on the admissible evidence that would be available and the applicable burdens of production and persuasion, a party would be entitled at trial to judgment as a matter of law either because of material facts that are not in substantial controversy or because of the lack of sufficient evidence to support some essential assertion. Facts in genuine dispute are assumed to be favorable to the party against whom summary judgment would be entered.

## DISCUSSION

Most of the standards governing hostile work environment claims have been developed in relatively recent cases involving claims of a sexually hostile workplace in violation of Title VII of

the Civil Rights Act of 1964. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986). Racially hostile working conditions, however, are similarly prohibited, and, indeed, many of the early cases involved such claims.[4] It is also clear that, since enactment of the Civil Rights Act of 1991,[5] the institution or maintenance of racially hostile working conditions may likewise violate 42 U.S.C. § 1981—the claim asserted in this case. While the standards under the two discrimination statutes are generally interchangeable, one must, however, keep in mind that claims under § 1981, unlike disparate impact claims under Title VII, require proof of discriminatory intent. *General Bldg. Contractors Association v. Pennsylvania*, 458 U.S. 375 (1982).

In the *Harris* case, 510 U.S., at 21-22, the Supreme Court articulated the following standards for claims of a hostile work environment:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

510 U.S., at 21-22. The Court identified a number of factors that should be considered in determining whether the conduct is, under the objective prong of the test, actionable. The relevant factors include (but are not limited to): (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.* at 23. While psychological harm may be relevant in determining whether the environment was subjectively hostile

---

4. Rodney A. Smolla, Federal Civil Rights Acts, § 9.08[4][b][ii] (3d ed. 1997) (citing *Firefighters Inst. for Racial Equality v. St. Louis*, 549 F.2d. 506, 514-15 (8th Cir.), *cert denied sub nom. Banta v. United States*, 434 U.S. 819 (1977); *Gray v. Greyhound Lines*, 545 F.2d. 169, 176 (D.C. Cir. 1976)).

5. The 1991 amendments to § 1981 were intended to restore the scope of the section to what had been generally applied in the lower courts prior to the Supreme Court's holding in *Patterson v. McClean Credit Union*, 491 U.S. 164 (1989).

to a particular plaintiff, proof of psychological injury is not required. *Id.* at 23.

Clearly, Ramsey's isolated June 11th remark—though offensive to the plaintiffs and the triggering event of this controversy—would not, by itself, be a sufficient basis for a hostile work environment claim; and the plaintiffs do not contend otherwise. Rather, what the plaintiffs focus upon is the employer's requirement that the waitresses—all of whom were black females—wear dresses or costumes that, from their perspective, are evocative of days of slavery. In their motion for summary judgment, plaintiffs ask that the court "take judicial notice of the existence of chattel slavery in Greene County in the 1800's and the history of Jim Crow and Ku Klux Klan terror that existed there"—and the court does so. Plaintiffs have asserted in their complaint that the prescribed dresses constitute "a source of great pain and suffering for Blacks that are compelled to wear them"—and the court does not doubt that some blacks had such a reaction, at least after their sensitivities and consciences were aroused by other events and public furor. Nor can the court conclude that such a reaction would have been unreasonable.

There are, however, other facts to be considered in assessing the possible liability of the defendants under § 1981. At the outset, it should be noted that the policy of requiring such uniforms (or costumes) for those serving the restaurant's patrons was established long before the defendants ever became involved in ownership or operation of the restaurant, a fact that bears upon any intent by the defendants to discriminate against employees based on their race. Also of significance is the fact that, prior to the picketing on June 17th, there were never any complaints to the defendants—whether by employees, patrons, or the public—about the waitresses' costumes. Nor is there any evidence that, during the period from 1977 (when Brown began operating the restaurant)

5

until the June 1994 incident, there were any other racial slurs,[6] epithets, or discrimination in the terms or conditions of employment at the Cotton Patch[7]—or even any complaints of such conduct. It is also significant—to some degree on the objective prong of the test, but to a greater degree on the subjective prong—that, before applying for or accepting employment at the Cotton Patch, the plaintiffs were all apparently aware of the long-standing practice that waitresses wear the costumes.[8] Finally, it is significant that, once advised of Ramsey's remark, the employer took appropriate actions to prevent a recurrence of such behavior.

Ultimately the issue in this case is whether the long-standing practice of requiring waitresses to wear these costumes, which understandably could be offensive to some blacks as a reminder of days of slavery, is sufficient, standing essentially by itself,[9] to permit claims of a racially hostile environment to proceed to trial by persons who terminated their employment before the employer had any opportunity to consider complaints about that practice or requests to be excused from it. The court concludes that such claims are due to be dismissed under Rule 56.

It would be a mistake for governments, whether through legislative enactment of new laws or through the judicial enforcement of existing laws such as § 1981, to engage in revisionist theories of history that attempt to obliterate all reminders of offensive, painful, or disturbing aspects of our national history. The preferable manner to preserve such reminders may be in museums, plays, or movies—mediums which can instruct about past injustices while perhaps portraying a message that

---

6. The only other racial slur that plaintiffs have been able to identify is a remark by Ramsey about a repair that she allegedly characterized as "nigger-rigging," a colloquial expression sometimes used—understandably offensive to blacks—to describe the ingenuous repair of a product accomplished by cheap shortcuts. Of similar meaning, but without the offensive racial connotations, is the term "jury-rigging."

7. In an effort to bolster their assertion of a racially discriminatory practice, the plaintiffs emphasize that the requirement of the costume affected only black females. While this is true, it misses the point. The dress requirement was imposed only on those who served the tables. While all these persons were black females, there is no evidence that whites or males ever applied for such positions.

8. Each waitress selected and paid for the material for her dresses and either made her uniform, or at her expense hired someone to make the uniform for her.

9. It should be emphasized that there is no evidence of other racially discriminatory practices.

such offenses should not be perpetuated or reinstituted. But to forbid, through judicial extension of laws such as § 1981, similar reminders to be portrayed in theme restaurants and other similar establishments would be unwarranted absent explicit legislative direction. No doubt, many potential employees or patrons might find the atmosphere of the Cotton Patch to be offensive to the extent of being unwilling to seek employment there or to go there for a meal. But many others, with different sensitivities, would not have such a reaction. For the court to afford plaintiffs the opportunity of perhaps prevailing at a trial of this case would potentially jeopardize the ability of persons to operate, for example, restaurants with a Mexican, Chinese, or Native American theme by having waiters and waitresses wear costumes calling attention to the ethnic backgrounds of particular minorities or even, as here, be reminiscent of historical periods in which such persons were mistreated by government or by particular elements of the population.[10/]

The court does not believe that § 1981 should be judicially extended to treat such operations as unlawful. This is particularly so with respect to claims for damages by employees, such as the plaintiffs here, based upon long-standing working conditions which, during their employment, no one ever complained about or asked to be changed. To the extent plaintiffs might have had viable claims of a hostile work environment, they could have returned to work on reopening of the restaurant and then pursued appropriate complaints about the working conditions to which they objected; they can hardly claim that the working conditions were so onerous or oppressive as to provide a basis for contending they were "constructively discharged." Their claims against their former employer fail as a matter of law and will be dismissed under Rule 56. Denial of judicial relief

---

10. The court, of course, understands and appreciates that the perspective of blacks—many of whose ancestors were forcibly brought to this country and then subjected to generations of legalized slavery—may differ not merely in degree but in kind from that of other minorities. The court also recognizes and appreciates that the costumes worn by waitresses at the Cotton Patch are representational not of an African heritage in which they can take pride, but rather of a historical period of slavery about which they would harbor great anger and resentment.

7

should not, however, be viewed as endorsement of the working conditions about which the plaintiffs complain; indeed, there is a potential role to be played through non-judicial means, such as through picketing or boycotts, in arousing the sensitivity of businesses to practices which offend segments of the society but which may not be subject to remedial action in the courts.

## RAMSEY AND BROWN

There are additional reasons why plaintiffs' claims against the individual defendants, Ramsey and Brown, likewise must be dismissed.

Ramsey had no involvement in the institution, maintenance, or enforcement of the policy requiring the waitresses to wear the costumes, nor did her duties involve hiring, firing, or supervising the plaintiffs and other waitresses. The only racially discriminatory or offensive conduct by Ramsey was her remark to Holley on June 11th, for which she promptly apologized to Holley and the other black employees. Such an isolated incident does not give rise to an actionable claim. *See, e.g., Meritor Sav. Bank v. Vinson*, *supra*, 477 U.S., at 67 (citing *Henson v. City of Dundee*, 682 F.2d. 897, at 904 (11th. Cir. 1982)).

Brown cannot be held responsible for Ramsey's remark. He was not present when the remark was made, and, by his later actions (including his suspending Ramsey and requiring her to go to a counseling session), it is clear he did not authorize, condone, or ratify such conduct. The costume policy to which the plaintiffs object is one for which he does have responsibility, since the practice, although in place when he began to manage the restaurant in 1977, could have been discontinued by him at any time during the next 18 years operating the restaurant. None of the plaintiffs, however, complained to Brown or anyone else at the Cotton Patch about the practice during the period they worked there—indeed, as previously noted, the first complaint by anyone occurred during the picketing on June 17, 1994. Such facts foreclose any claim by them for damages against Brown

8

premised on intentional discrimination under § 1981.

## CONCLUSION

By separate order, plaintiffs' motion for partial summary judgment will be DENIED and defendants' motions for summary judgment will be GRANTED. While costs are to be assessed against plaintiffs, the court does not—as, hopefully, this opinion indicates—view their claims as frivolous or brought in bad faith, and accordingly attorneys' fees will not be awarded to the prevailing defendants.

This the _19th_ day of _June_, 1997.

_____
Chief Judge Sam C. Pointer, Jr.